39 C.C.P.A. (Patents)

## In re WEBERSINN.

### Patent Appeals No. 5775.

United States Court of Customs
and Patent Appeals.

June 5, 1951.

Rehearing Denied Sept. 28, 1951.

---

Gustave R. Thompson, New York City
(A. Yates Dowell, Washington, D. C., and
Newton A. Burgess, New York City, of
counsel), for appellant.

E. L. Reynolds, Washington, D. C. (H.
S. Miller, Washington, D. C., of counsel),
for the Commissioner of Patents.

Before GARRETT, Chief Judge, and
JACKSON, O'CONNELL, JOHNSON,
and WORLEY, Judges.

GARRETT, Chief Judge.

This is an appeal wherein United Chro-
mium, Inc., as the assignee of the applica-
tion of Theodore H. Webersinn, deceased,
for a patent for certain alleged "new and
useful improvements in Methods of Produc-
ing Fissured Net-Works in Chromium Elec-
trodeposits," seeks review and reversal of
the decision of the Board of Appeals of the
United States Patent Office affirming the
denial by the Primary Examiner, herein-
after referred to as the examiner, of all
the claims, 11 to 14, inclusive, embraced in
the application, serial No. 510,210, filed No-
vember 13, 1943. No claims were allowed.
All the appealed claims are method claims.

The board expressly disapproved certain
of the references applied by the examiner
and also disapproved the latter's rejection
of the claims for indefiniteness and "as con-
taining an improper step," but approved
their rejection as being unpatentable over
the method claims 2 and 3 embraced in a
patent, No. 2,430,750 issued November 11,
1947, to Theodore H. Webersinn and Jacob
Hyner, as joint inventors, upon an applica-
tion, serial No. 545,506, filed July 18, 1944,
which patent also is shown to be assigned
to United Chromium, Inc., the assignee of
the instant application. The co-inventor,
Webersinn, was the same person as the de-
ceased applicant in the instant case.

In view of what seems to us to be the
highly technical character of the claimed
invention, we here reproduce all the ap-
pealed claims, although it does not seem to
be suggested by appellant that there is any
patentable distinction between them.

The technicality of the subject matter
also leads us to quote extensively and ver-
batim from the findings and arguments
instead of attempting to paraphrase them.

The claims read:

"11. In the post-treatment of electro-
deposits of chromium of a nature, acquired
from the conditions under which they are
electrodeposited, that preferential dissolv-
ing thereof occurs at lines in the form of
a mesh, the chromium electrodeposits of
said nature being designated herein as
'predisposed' chromium and being of ap-
proximately one-thousandth of an inch min-
imum thickness, immersing the 'predisposed'
chromium electro-deposit in an electrolytic
etching solution which chemically attacks
active chromium, passing electric current
of the order of approximately one quarter
to three amperes per square inch to the

'predisposed' chromium electrodeposit connected in the electric circuit as a cathode, maintaining the 'predisposed' chromium immersed in said electrolytic etching solution to dissolve the said 'predisposed' chromium preferentially at lines, according to its nature, thereby forming a net-work of fissures in said predisposed chromium electrodeposit, as distinguished from the microscopic cracks commonly found in chromium electrodeposits, and removing the 'predisposed' chromium electrodeposit from the action of the current and the solution before the chromium in the areas between the fissures is stripped to the basis metal.

"12. In the post-treatment of electrodeposits of chromium, according to claim 11, discontinuing the passage of current in the course of the development of the fissure net-work, the dissolving action being continued by the solution while the 'predisposed' chromium remains immersed therein.

"13. In the post-treatment of electrodeposits of chromium, according to claim 11, further comprising passing current anodically to the 'predisposed' chromium electrodeposit in the same solution in which it is immersed, after the fissure net-work has been developed, to stop further development of the fissure net-work and action on the chromium.

"14. In the post-treatment of electrodeposits of chromium of a nature, acquired from the conditions under which they are electrodeposited, that preferential dissolving thereof occurs at lines in the form of a mesh, the chromium electrodeposits of said nature being designated herein as 'predisposed' chromium and being of approximately one-thousandth of an inch minimum thickness, immersing the 'predisposed' chromium electrodeposit in a solution which chemically attacks active chromium maintaining the 'predisposed' chromium immersed in said solution to dissolve the said 'predisposed' chromium preferentially at lines, according to its nature, thereby forming a net-work of fissures in said predisposed chromium electrodeposit, as distinguished from the microscopic cracks commonly found in chromium electrodeposits, and re-moving the 'predisposed' chromium electrodeposit from the action of the solution before the chromium in the areas between the fissures is stripped to the basis metal."

There are four claims in the reference patent, all being method claims. Claim No. 2 is dependent on claim No. 1, which is technical and long. Claim No. 3, the second of the two upon which the appealed claims were rejected, also is technical and long. The tribunals of the Patent Office held that the appealed claims are not patentably distinguishable from the indicated patent claims, and appellant, in order to prevail, has the burden of making it clear to us that there was error in the decision of the board affirming that of the examiner.

As to certain of the examiner's holdings, the Board of Appeals, in effect, reversed, and we have no concern with those holdings, but, as has been stated, the board definitely approved the rejection on the patent to Webersinn et al., and with that we are concerned.

The contention on behalf of appellant appears to be that the appealed claims are limited to an etching step of *finishing* the chromium plating, while the claims of the reference patent are limited to *pitting* the chromium. The following is taken from appellant's brief:

"In 1942 [the year preceding the filing of appellant's application] porous chromium plating was being used by both the U. S. Navy and the Army Air Force. The Navy was using chromium plate on diesel engine cylinder liners, which were subject to long, continuous use. The Air Force was testing chromium plate on aircraft cylinder barrels subjected to extreme rates of wear in dust ladened atmosphere.

"For the long continuous use in diesel engines it was desirable to obtain a porous chromium surface with deep porosity so that as the cylinders wore the porosity would still remain. On the other hand, to utilize the porous chromium plate in the aircraft cylinders under the extreme speeds, temperatures and bearing pressures of high output aircraft engines, the special need was a chromium bearing surface that

would be free from 'seizing' and 'galling' faults, and excessive wear on the piston rings; the Air Force found that channel-type porosity with plateau areas of a certain size met this requirement.

"Here, then, were two different problems, one of which was worked on by Webersinn and the other by Webersinn and Hyner.

"To obtain deeper fissures and less loss of surface chromium than was being obtained by prior methods, Webersinn (sole) invented the method of attacking the chromium claimed in his application on appeal. The advantages of the Webersinn cathodic post-treatment of the predisposed chromium over previous methods is described in his specification (Transcript, p. 6, 1. 14 to 1. 9, p. 7). This antedated the Webersinn and Hyner invention.

"The matter of obtaining plateau areas of definite size was the joint work of Webersinn and Hyner. Webersinn and Hyner discovered that the key to plateau size was in the process of electrodepositing the chromium, and they invented a process by which chromium could be deposited. so that when a fissure net-work was later formed therein by attacking the chromium, the plateaus in the net-work would have the desired size.

"Webersinn's invention, therefore, was directed to a part of the problem of producing porous chromium which was entirely different from the other part of the problem to which the Webersinn and Hyner invention was directed. Webersinn's invention was directed to the *treatment* of the completely deposited chromium plate. Webersinn and Hyner's invention related to the *deposition* of the plate. (Italics quoted.)"

The lines of appellant's specification referred to parenthetically in the fourth paragraph of the above quotation read: " * * * Fissure net-works with small size plateaus are best suited for obtaining pit-type chromium surfaces, and fissure net-works with large size plateaus are best suited for obtaining mud-crack type chromium surfaces.

"The progress of the fissure net-works in the course of the post-treatment can be observed visually, by removing the article from time to time and examining it.

"Cathodic post-treatment as herein described has certain advantages and produces unusual results. Ordinarily corrosion or attack on a metal in an electrolyte is inhibited by making the metal cathode. I have discovered that by making chromium plate of proper characteristics cathode in a suitable electorlyte it can be made [to] dissolve readily and the dissolving action on the chromium be largely or preferentially confined so as to develop unusually deep cracks or fissures.

"This is of great practical importance, because the thickness of chromium which must be deposited prior to the post-treatment (and the time required for such electrodeposition) is very much less for obtaining the desired fissured chromium surface than it would be otherwise. Moreover, good depth of fissures is obtained in a relatively short time, and for a given thickness of chromium electrodeposit a greater depth of fissures can be obtained than for instance by anodic post-treatment."

Concerning the matter so quoted the specification comments: "From this it follows that for a given thickness of chromium electrodeposit, more mechanical finishing can be done on a cathodically post-treated chromium electrodeposit, where this is desired, than on one post-treated anodically, without obliterating the fissures or reducing too greatly the depth thereof."

In his official statement, summarizing his reasons for rejecting the claims, made following the appeal to the board, the examiner said, *inter alia:*

"This application claims a method for producing fissures in a chromium surface, the fissures serving to retain a lubricant to facilitate the moving of a metal surface against the chromium layer. The chromium layer is deposited from a somewhat modified chromium plating bath, and is then converted to the desired fissured surface by connecting it as cathode in an acid solution. Suitable acids are hydrochloric sulfuric; sulfuric mixed with chromic; phosphoric; citric; and oxalic acid. With a current density of ¼ to 3

amperes per square inch, the chromium surface is 'activated,' and the acid will then dissolve the chromium selectively to yield a network of fissures. In the activated state, the acid by itself is said to be able to attack the chromium, so that the current may be shut off (if desired) and the attack will continue. For certain acids (such as hydrochloric) the cathodic activation is unnecessary, and the fissures are obtained by simple immersion in the acid.

&ast; &ast; &ast; &ast; &ast; &ast;

" &ast; &ast; &ast; Claim 11 is drawn to a four step process, viz.: (1) immerse the chromium in an electrolyte which chemically attacks active chromium; (2) make the chromium a cathode, and pass ¼ to 3 amperes per square inch; (3) maintain the chromium in the electrolyte; and (4) remove the chromium surface from the action of the current and the solution before any base metal is exposed.

&ast; &ast; &ast; &ast; &ast; &ast;

"Claim 12 adds to claim 11 the step of shutting off the current before the etching is completed, and allowing the chemical attack of the solution to complete the etching. This step is not believed to confer patentability on the claim.

&ast; &ast; &ast; &ast; &ast; &ast;

"Claim 13 adds to claim 11 the step of passivating the chromium by reversing the current flow, and thus making the chromium the anode in the electrolyte of claim 11.

&ast; &ast; &ast; &ast; &ast; &ast;

"Claim 14 is drawn to the etching of the chromium deposit by simple immersion "in a solution which chemically attacks active chromium" until the desired etching is achieved. (This claim appears to be based on example 5 &ast; &ast; &ast; of the specification, and apparently the words 'active chromium' should be 'passive chromium' as neither claim 14, nor example 5 include any activation step.)"

Appellant apparently filed a reply brief, not included in the record, to the examiner's summarization, because in a paper styled "Examiner's Reply to Brief, March 8, 1949," it is said:

"2. Applicant states on page 9 of his [reply] brief that claim 14 is correct in 'active chromium' (original line 7). The examiner had assumed that applicant intended 'passive chromium', because example 5 of his specification (page 7 thereof) does not include any activation step prior to the immersion in hydrochloric acid.

"Because of applicant's interpretation, claim 14 should be additionally rejected for lack of adequate disclosure (or as broader than the alleged invention). All examples place the chromium in a solution which attacks passive chromium, for the simple reason that the as-deposited chromium is passive. Applicant does not disclose any acid which attacks active chromium, but which cannot attack passive chromium. Nor does applicant disclose any method in which the deposited chromium is naturally in, or is converted to, the active condition."

Of the Webersinn et al. patent the examiner said: "The patent to Webersinn et al. (assigned to the assignee of the instant application) claims a method of producing a fissured chromium surface by electrodepositing the chromium from a bath in which the temperature is specially correlated to the ratio of $CRO_3$ to $SO_4$ ion, thus producing a chromium deposit that responds favorably to the subsequent etching step to yield the desired fissured surface. In claim 2 of the patent, a specific etching procedure is recited, which is identical (except for a minor variation in current density) with example I (page 5, lines 11 to 18) of this instant application."

The examiner also made the following comparison between the appealed claims and the claims of the reference patent:

"Claims 11 through 14 have also been finally rejected as lacking in invention over claims 2 and 3 of Webersinn et al. Claim 2 of this patent is drawn to a method of depositing chromium from a special bath to yield the so-called 'predisposed' chromium mentioned in the instant claims, followed by cathodic etching in a phosphoric acid type electrolyte. Claim 11 of the instant application differs from patented claim 2 in two respects: (a) the first step of the pat-

ented claim is put into the introductory portion of a Jepson form claim, and (b) the specific cathodic etching of patented claim 2 is recited generically, although example 1 of this specification is nearly identical with the second step recited in patented claim 2. Both patented claim 2 and instant claim 11 require electrodeposition of 'predisposed' chromium, and cathodic etching to produce a net-work of fissures. These two claims differ only in the scope of each step, and so are inventively indistinct; In re Loiseleur, 597 O.G. 457, 1947 C.D. 99, 34 C.C. P.A. [Patents] 765, [158 F.2d 309, 72 US PQ 110]. As discussed above, claims 12, 13, and 14 do not add inventive matter to claim 11, and therefore claims 11 through 14 are patentably indistinct from claim 2 of Webersinn et al.

*"Claim 3 of the patent recites a specific chromium plating bath, combined with the generic step of 'etching the chromium * * to develop a fissure net-work.' It is thus seen that the etching step is recited more generically in patented claim 3, and more specifically in patented claim 2, than in instant claim 11. Claim 11 being merely intermediate in scope between patented claims 2 and 3, is not a separate invention."* (Italics supplied by us.)

Except as to the recited discussion of claim 14 there does not appear to be any substantial difference between the analysis of the application claims and the claims of the reference made by the examiner and that made on behalf of appellant, but the brief for appellant presents a statement which we hereinafter discuss.

The board is alleged to have erred in construing certain language of claim 2 of the patent (meaning, we suppose, the reference patent) "as defining a specific step in the process of claim 2 of the Webersinn and Hyner patent."

Inasmuch as the Webersinn and Hyner patent is the reference patent, this assignment of error is not very clear to us.

The language claimed to have been misconstrued reads: " * * * wherein the fissure network produced by the etching is of the character obtained by etching the aforesaid chromium electrodeposit in an etching solution consisting of 290 g/1 phosphoric acid, 10 g/1 potassium dichromate and 2 g/1 trivalent chromium added as potassium chrome alum at a temperature of 160° F., in which solution the chromium electrodeposit is connected as a cathode and current passed thereto for 15 minutes at a cathode current density of one-half ampere per square inch."

This is supported specifically by a section of Example I in the specification of the Webersinn et al. patent, the section being headed "Etching," and the only difference between it and a section headed "Post-Treatment," appearing in Example I of the instant application, is that the latter recites as the last item "Cathodic Treatment 0.3 Amps. per sq. in. for 30 min."

It seems to be appellant's position that the phraseology should be construed "as defining the fissure net-work produced, irrespective of what so-called etching step is used to produce the net-work."

Such a construction apparently would be in line with appellant's contention that "no specific way of developing the fissure net-work is defined by any of the claims of the patent," which, seemingly, is technically true, but, as said in the brief of the Solicitor for the Patent Office: " * * * as a matter of substance, it cannot be denied that the language of the dependent part of claim 2 certainly at least suggests a very specific way of developing the fissure net-work. The Board of Appeals was cognizant of the technical difference, and after quoting the language of claim 2 which appellant says is not a way of etching, but only a definition of 'the physical character of the fissure net-work,' made the holding that 'this recitation is the equivalent to a statement that the etching is carried out under the above described conditions * * *.' "

The "above described conditions" so referred to by the board are the conditions quoted from patent claim 2, and we agree with the statement of the board that "this step in claim 2 of the patent is much more specific than in any of the claims" on ap-

peal; since "it calls for etching the chromium so as to produce therein a fissure network."

The brief on behalf of appellant is elaborate and interesting but most of its reasoning impresses us as lacking in sound logic. To attempt to follow it and reply seriatim to each of its many contentions would lead us into much repetition and unnecessarily lengthen this opinion.

The brief submits two tests of patentability. The first test involves two questions, viz.: (1) Do the appealed claims distinctly differ from the invention presented in the Webersinn and Hyner patent? (2) Do they constitute invention?

In support of the contention that they constitute invention the brief states: "The Board of Appeals reversed the Examiner's rejection of the claims on appeal on the prior art, holding the subject matter to be patentable over the prior art. The subject matter of the claims on appeal, therefore, fills the requirement of being an invention."

The foregoing statement is too broad. The board reversed as to the examiner's rejection upon *certain* of the prior art, but not as to his rejection upon the joint invention in which Webersinn shared.

Its holding as to this, of course, amounted to a holding that the instant application presented no invention—that is, nothing inventive over the prior work which Webersinn helped perform.

In the effort to show that the appealed claims constitute something different and distinct from the joint patent, the brief for appellant says: " * * * the claims on appeal do not call for any step or steps for electrodepositing the chromium. The subject matter of the claims relates solely to the development of a fissure net-work in a chromium plate. The claims define a specific procedure for that purpose. The chromium plate must of necessity be susceptible of having a fissure net-work developed therein, but chromium plate predisposed to the formation of a fissure network therein can be deposited in ways known to the prior art and outside of the claims of the Webersinn and Hyner patent. It is, therefore, believed that the subject matter of the claims on appeal is also distinct and different from the subject matter covered by the claims of the Webersinn and Hyner patent."

The brief of the Solicitor for the Patent Office, we think quite pertinently and fully, replies to the foregoing as follows: " * * * The alleged distinction is submitted to be one without a difference. Notwithstanding appellant's argument, it is quite obvious from the language of the claims at bar that the claimed process cannot be carried out until there has been electrodeposition of chromium. Whether the claimed process begins with the treatment of an electrodeposit of chromium, or actually includes a step of electrodepositing chromium, is submitted to be a matter of form rather than of any actual substance."

Appellant's second test for patentability relates to the matter of possible infringement. It is argued that the invention defined by the claims of the reference may be practiced without infringing the claims on appeal, and ways are stated in which it is alleged this may be done. Of course, if that be correct, it would seem to follow that the claims of the application here involved might be practiced without infringing the reference patent which apparently has ten more years of life. We doubt whether the assignee of the patent would acquiesce willingly in that. The board pointed out that claim 3 of the patent defines the etching step broadly—much more broadly than does claim 2—and the Solicitor for the Patent Office suggests that "any way of etching infringes this particular part of claim 3 of the patent."

The solicitor's brief additionally states: "Furthermore, it is equally obvious that when the specific way of etching claimed in the application claims at bar is used, claim 2 of the patent is infringed, because the use of that specific way is bound to produce the character of fissure net-work described by the language of the dependent part of claim 2. This follows of necessity from the close similarity of the process suggested by the language of claim

2, to the process of etching of the claims at bar."

We are not convinced that the Board of Appeals erred in affirming the examiner's rejection of the claims on the patent of Webersinn et al. cf. In re Willoughby, 88 F.2d 482, 24 C.C.P.A., Patents, 1033, and cases therein cited.

The decision appealed from is affirmed.

Affirmed.